Good morning and aloha. My colleagues, Judge Graber, Judge Clifton, and I welcome you to the Ninth Circuit. Today we have three cases on the oral argument calendar, but before we get to those, we have several cases we have submitted without argument. Sharp v. Federal Highway Administration is submitted, and that's it. So we have only one case that's been submitted. We are going to take the argument cases in the order in which they appear on the calendar, and the first case is Barrett Business Services v. Colmenero. Good morning. May it please the Court, Phil Talmadge here representing Barrett Business Services, Incorporated, BBSI, and I'd ask to reserve five minutes of rebuttal time if I could, Your Honor. Decisions regarding trade secrets are factually rich. The district court here erred in dismissing BBSI's state and federal trade secret claims against Appellees Alejo and Colmenero, who secretly set up a rival business months before their departure from BBSI. That court had, in fact, previously denied a Rule 12 motion to dismiss on the very same grounds and on the very same evidence. On summary judgment, fact issues abounded. Well, Rule 12 don't turn on evidence. It doesn't, Your Honor, but it was on the very same essential facts that were ultimately proven by BBSI on its different six points. I don't think you can take much from a Rule 12 motion to dismiss decision when it gets to summary judgment, but okay. But in any event, the court had denied the motion to dismiss the Trade Secret Act claims, both state and federal, on essentially the same grounds, the same facts that were adduced. In fact, issues abounded on each and every one of the elements of a trade secret claim, both state and federal. The district court also erred in levying attorney fees under the Lanham Act for this being an exceptional case when it was not. Counsel, I have a question about that. Yes, Your Honor. If, just for the sake of this question, assuming that we agree with you that there are genuine issues of fact regarding the trade secrets claims, does that necessarily have any effect on the fees which appear to be solely under the Lanham Act claim? I think the issues are, in fact, distinct, Your Honor. But we've asked for a reversal on both. Correct. I'm just trying, I was just trying to confirm that they're not intertwined. I don't think they are. I think the fact of the matter is it probably demonstrates that under the totality of the circumstances, perhaps, this was not an exceptional case, particularly if we have a set of individuals who breached the duty of loyalty and there is an abiding state. But you haven't made that argument in your brief, right? You have not said, correct me if I'm wrong, but to follow up on Judge Graber's question, you have not said in your brief, if you reverse on trade secrets, then that's a separate ground for reversing on the Lanham Act. No, we have not, Your Honor. Okay. And to ask an additional follow-up question, am I correct that your argument is this is not an exceptional case, no fees are appropriate, but you have not argued that if hypothetically we reject that, we should send it back for a fee redo? You've not challenged the amount, is that right? We've not challenged the amount, that's correct. Thank you, counsel. We've also noted that in fact the costs that were levied by the trial court here far exceed the statutory costs and the Romini Street decision of the Supreme Court indicates that only statutory costs were available to the appellees. For taxable costs, but it's not unusual for other costs to be awarded as part of an attorney fee award, is it? No, that's in fact true, Your Honor, but in this particular case under Romini Street, what Justice Kavanaugh wrote in that case was you have to have some indication in the statute itself that there's some opportunity to recover something beyond the taxable costs, the statutory costs. No indication But here we've got an award of attorney's fees, which the statute authorizes. So I'm not sure why the statute's authorization of attorney's fees isn't sufficient to cover non-taxable costs. Because in Romini Street, the Supreme Court said that it wasn't. I mean, you have to have something more. You have to have some indication that there's an opportunity to recover legal expenses as an element of an attorney fee request and there's no such indication in these statutes that that's something that's available. Sure. What I'm really curious about the attorney fee award, the district court described the Lanham Act claims as extraordinarily weak. And it identified the claim as being defendants posing as agents of your client to jewel fruit. And then the district court said that Burnett has come forward with no evidence to support this allegation. This claim is dismissed. And in your brief, you argue that the claim was not frivolous, but I don't see where you've established or identified the evidence that the district court said hadn't been presented. So what evidence was presented? Where was the district court wrong in its statement? There were two things, Your Honor. First, there was the approach to jewel fruit, but also the taking of the staffing agreements and taking the BBSI staffing agreements, deleting BBSI's mark, and inserting persona on it. These individuals literally took the agreements, the paperwork that BBSI used, and tried to use it as their own. So I'm looking at your brief on the attorney fee issue. So where do I find that? We argued that. It's in the brief. That's not the question I'm asking. Where in the brief? I mean, you can tell me you've argued it, but I looked at it. I didn't find it. So my question now is where do I find it? I don't have the page number off the top of my head, but I'm happy to provide that to the court. Counsel, maybe you can do it in your rebuttal. Yes, I'll be happy to do that. The bottom line is we did make the argument, but the simple proposition is simply because a claim is dismissed on summary judgment doesn't necessarily connote that it's an exceptional case. It doesn't stand out from the rest. Well, what the district court said was that no evidence was presented to support this claim. If that's the case, it would seem exceptional. You're telling us evidence was submitted, and that's what I was looking for. If evidence was submitted, then it wouldn't stand out. But would you agree that if no evidence was submitted, it would stand out? Well, it would be it would be a weak case. It would be something that would be dismissed. But would it be exceptional standing out in the sense of was there misconduct on the part of the party? No. Was it frivolous? No. If you assert a claim and try to pursue it and present zero evidence in support of that claim, hard-pressed to say that's not unusual and extraordinary. Well, there's some indication there has to be something in the nature of misconduct on the part of the party. There has to be something that's procedurally improper. Alleged claim for which you submit no evidence? Isn't that enough? In this case, we did submit the evidence, and I'll provide that on rebuttal. I'll make note of where that is in the brief, Your Honor. Let me turn first to the trade secret acts issue. The trade secret acts elements are the same under state and federal law, essentially. Did the plaintiff have a trade secret? Was it appropriated by the defendant? Was the plaintiff harmed by that? And these are factually rich kinds of decisions. In fact, in Washington, under the Washington UTSA, there are pattern instructions that govern all of the elements of a trade secret cause of action, and cases state and federal routinely reverse summary judgment decisions on the question of whether there is or is not a trade secret. In this particular case, fact issues abound on all of the key issues. So starting first with the question, did BBSI have a trade secret? It did. Under the terms of the Noah Grosky case and also under IntelliClear, you have a circumstance where you had customer lists that BBSI had. They had lists of agribusinesses in the Yakima Valley with whom they did business, but those lists were not just simply an indication, a listing of the particular agribusiness. It had significant information annexed to that list, information such as, you know, what are the particular needs of the particular customer? What did they really require with respect to temporary staffing that they needed? Vetted individuals, individuals that BBSI had laboriously compiled who met the needs of that particular business. Here are all the individuals that meet those needs. And then the pricing margin. What do we need to make money on this particular client for our purposes? The question that arises is, do these trade secrets have economic value? Do these customer lists have economic value? Were they protected by BBSI? Fact questions abounded as to both of those issues. You have these lists that were protected by confidentiality agreements in the employee handbook and in the code of conduct for employees. You had these protected with cybersecurity notations. So you have the protection that was undertaken by BBSI. And do they have economic value? Well, it's pretty obvious that if you know the whole card of your rival competitor and that pricing margin is the whole card that that rival has, that's a fundamentally important value for you as a competitor. You will always be able to undercut that. What rival wouldn't want to know all of the staffing individuals that meet the needs of particular customers and the particular price margin for each particular customer? That was the nature of those lists that these individuals appropriated. Then the question arises, did they appropriate them? And that's a fact question as well. Again, WPI pattern instruction in Washington applies to this question. Circumstantial evidence suggests that the appellees took that information. They undercut the price that BBSI had for each individual customer known to these individuals. So you have that appropriation factor. And then was there harm to BBSI? Mr. Parton's information, Mr. Parton's declaration indicates a lost profit of $7.4 million to BBSI, a pretty significant harm. All of these elements are issues for a jury. All of these issues are issues of fact. All of these issues should not have been resolved by the district court on summary judgment. It appears to me at least that what the district court did was the district court believed that there are a limited number of agribusinesses in the Yakima Valley and believed that that was just a list of the customer, the particular agribusinesses. That district court did not appreciate the individual vetted employees pertinent to each customer, the price margin pertinent to each customer, the individual information pertinent to each customer that BBSI had laboriously developed as part of these customer lists. For all of those reasons, we ask the court to reverse the decision of the district court on the Trade Secret Act issue and also ask the court to reverse the decision of the court on the Lanham Act attorney fees and the costs for the reasons we've already discussed. Thank you. Just about the same height, almost. Good morning, Your Honors, and may it please the court, Justo Gonzalez of Stokes Lawrence, Villa Kanye Moore and Shore for the appellees. Summary judgment on the trade secrets misappropriation claim should be affirmed for two principal reasons. There's no evidence presented that a trade secret exists and there's no evidence in the record that any of my clients misappropriated any trade secrets. There's no evidence that customer lists and pricing and that sort of thing are trade secrets? That is correct. We know this because of the public filings of Barrett Business Services, BBSI. It is a publicly traded company. Its SEC filings disclose, and my clients have in the record testimony supporting this, that it prides itself on being a decentralized company. The staffing model relies on the individual efforts of each office. They rely on the, quote, scrappiness of their salespeople, and they have a competitive threat in the marketplace because they have a very lean sales force that relies on leveraging referral partners. And as part of these public filings, it included compilations of its pricings, its needs, its temporary employee information. So interestingly enough, Your Honor, there is no compilation. There was no compilation of any of this data that my friend just described and Your Honor is inquiring about during the time that my clients worked at BBSI. But for my question, even if you're correct and the like most favorable to the plaintiff, was anything during the time your clients were there in those categories publicized, made public? Yes, they were. What? BBSI advertises its clients on a rotating picture frame, like a carousel on its website. Its clients do not... The carousel lists pricing information and margins? The margins are on the SEC filings. It's 11% overall. But that is a customer by customer, what the margin is, what the pricing is for that customer, what that customer's needs are? And that is not a secret, and that's the key here. Secret to whom? That is not a secret to anyone. Well, it's a surprise to me. I don't know any of that stuff. Well, it's readily available to the public, Your Honor. How? How do I find that out? A member of the public, a competitor, can reach out to Pricepacking or Roach Fruit, as happened in this case, and as representatives of those customers testified in this case, and offer their staffing services. And Roach Fruit, the representative of Roach Fruit, Pricepacking, Mercer Fruit, all of whom went to high school, by the way, with my client Santiago Alejo in Yakima, and say, you want my staffing business? Kelly is giving me a 33% markup. BBSI is giving me a 36% markup. You need to be competitive with that markup. And that's how a competitor gets that information. That's not quite the same thing. That's what the customer, looking for the best possible deal, says you've got to be. That may or may not be what, actually, the competitive firm is offering to the customer. It's a real advantage to know what the competitor actually has offered from the competitor's perspective. What the customer is asking for may be a different question. And how publicly available is it? If you're just saying the customer says he wants this, well, that tells you what the customer wants. It may or may not tell you what the competitor is offering. And this goes to the know-how that cannot be a trade secret. Santiago Alejo and Chuck Colmonero, Charles Colmonero, have been in this business for decades. Santiago Alejo himself was a temporary worker, supported himself through high school and community college, in the hop fields. He knows this community. He knows the individuals who make these decisions. So, counsel, I'm looking at page 1132 of the excerpts of record, which are a series of July 11th, 2022, emails between Kathy Gonzalez and Santiago Alejo. And I'm sure you're familiar with it. But it says, no problem. Can we set up a service agreement from Santiago Alejo? Can we set up a service agreement just to have those ready? Also, if you would like, we can staff for the other side at Roach Fruit. I know that they have had a tough time filling those positions, and I can do it at a lower rate. The lower rate that's referenced is the rate at the former employer? That lower rate is the rate that BBSI and Kelly Services and Express offer to Roach Fruit. It's not exclusive to BBSI, and it's a rate that Ms. Gonzalez testified she told Mr. Alejo he needs to beat. That is in the record from Ms. Kathy Gonzalez's declaration of December 1, 2022, and also in her deposition testimony, which is in the record, and I can provide those citations. How does this make this undisputed fact? I mean, this all sounds very factual. It is factual, but it is BBSI's burden as the proponent of the trade secret to establish each element, that it has information that belongs to it, is not readily available to the public, that cannot be reverse engineered easily as can be done here, and that they've taken reasonable measures to maintain secret. By saying that they have the burden, it seems to me that you're doing the opposite of what we're required to review on summary judgment, which is the absence of any genuine issue of material fact. They may lose by not carrying their burden, but their only burden now is to demonstrate that there's a genuine issue of material fact on any one of those criteria. And here there are none because the evidence that, well, the record that BBSI argues is evidence is speculation. It's similar to the allegations in support of the Lanham Act claim that was found to have a dearth of evidence that was based on speculation and assumptions. It is assumed that by BBSI that the appellees utilized secret information because that's the only way they could have done business. Let me ask you this question. The district court said in its ruling on the Lanham Act that the evidence was weak. It didn't say there was none. It said it was weak. However, if that's identical to what's happening in the trade secret, weak evidence on a material point still creates an issue of fact, does it not? What the district court held in its ruling on the Lanham Act. That was a yes or no question. If the evidence is weak but it exists and creates an issue of fact on any of the trade secret requirements, isn't that enough? Well, the test is no because the test is whether a reasonable jury could rule any other way. Is there an issue that is genuine? Not issues. You can have issues in droves, but the issue has to be genuine. And here there are none. And what the district court held on the Lanham Act claim was that it was exceptionally weak, that there was a dearth of evidence and it was based entirely on speculation. Okay, but that isn't the summary judgment standard. Correct, but Your Honor is referencing the Lanham Act. Well, you're the one who said it was an identical ruling on the part of the district court and that's what I was exploring. Understood. I appreciate the clarification, Your Honor. So what we have here is a proponent of trade secrets who can't identify any one thing. There's no one piece of information that is a trade secret. So what they're attempting then to do is to bundle them together. Well, if you put it all together, but there's no evidence in the record that BBSI ever put them together. The spreadsheet that BBSI pointed to down to the district court and on appeal was a document created specifically for this litigation. That was the gross margin report that Mr. Jones, the then general manager of BBSI's Portland, or rather Oregon and Washington offices. There were client lists, right? There were no client lists. So you couldn't look at the information that they had and list clients from that? There's no evidence in the record that that could be accomplished. No evidence in the record that by looking at their documents you couldn't list who their clients were? Which documents, Your Honor? That's the question that BBSI could not answer. Which document, which database, where is it held, did Mr. Alejo have access to it, and did he in fact access it? It's interesting. There is reference in the record to a list of workers. And there is testimony that my friend is relying on on appeal to suggest that Mr. Alejo obtained this list of temporary workers. But if you look at the actual record, what we have is testimony from an employee that they printed something off that was a list of temporary workers for one particular client. There's no date of when it happened. And they say, when I went to the printer, it was gone. I didn't find it. That's it. There's no connection to Mr. Alejo, no evidence that he made off with any list. And there's no evidence that it would even be useful for someone in his position to have a list of temporary workers. Because this is an industry where you have employees, the temporary workers themselves are highly mobile. They work for multiple staffing agencies at the same time. They all talk to each other. They know who each other are. And they're not subject to non-competes. There's no evidence in the record that knowing who the temporary workers that the plaintiff employed would be useful to somebody who was starting their own business and would be in the business of using those temporary workers. That is actually correct because the workers, this is not a stable workforce. There's a huge amount of turnover. And they respond in this industry, and this is in the record, to Facebook ads. They're looking at jobs, Yakima Valley jobs, Facebook posts. It has the personal cell phone number of the salesperson at BBSI. This, again, goes to whether they took any reasonable measures to keep this information secret. They had a bring-your-own-device policy at this business. Employees were encouraged to use their personal cell phones to make sales calls to clients, to keep client contacts, to keep temporary workers, and to have temporary workers who were interested in a job reach out to them on their personal cell phones. Mr. Alejo signed an employee handbook that listed confidential information that he knew he had to keep confidential, right? That was a policy of BBSI. And it says in there, for example, confidential information will be made available to me, including product designs, marketing strategies, customer lists, pricing policies, and other related information. I understand that this information is proprietary. It's on ER 1335. Mr. Alejo signed that, right? He did indeed, Your Honor. And that describes categories of information that could qualify for trade secret protection if the standard is met. And here there isn't specific information that falls into one of those categories that qualifies for trade secret protection, and there's no evidence of misappropriation. You cannot protect through the Trade Secrets Act, either the state or federal statute, information that someone learns over a lifetime of work, their know-how, their expertise in an industry. Any salesperson in this industry knows what the range of markups are. They know who the decision makers at companies are. The agricultural industry in Central Washington is very small. It is a small community. Everyone knows each other. And you can, as was demonstrated below to the district court, with five minutes of Google research, find the decision maker, the HR person, with their e-mail and phone number, at every packing house in the Central Valley in Washington. So it is a very difficult road to establish the existence of a trade secret in this industry, and the district court correctly found that there were no genuine issues here. The standard on the trade secrets claim was not met. Turning quickly to the Lanham Act, we certainly argue that the decision to award fees under the Lanham Act was within the court's sound discretion. And I want to note before we run out of time here in my last 15 or so seconds, the argument that non-taxable costs under Section 1928 are not available under the Lanham Act is an argument that was not made below. It has been waived. That is invited error by BBSI. And Grove v. Wells Fargo is still good law. There are district courts throughout the Ninth Circuit that in the last couple of months have been awarding witness fees, travel costs, traditionally non-taxable costs in Lanham Act cases. So with that, Your Honors, I would argue and urge you to affirm the district court orders. And I thank you for your patience. All right. Thank you. Counsel, you have some time left for rebuttal. Thank you, Your Honor. First, with respect to Judge Clifton's question about whether the issue of the agreements was raised, it's in the second brief at page 14. And I note as well that in their responsive brief, they did not deny that those agreements had been taken, simply lifting the BBSI mark and plopping Persona's mark on those agreements. Now, with respect to the trade secret argument, my colleague didn't respond to the court's question about a number of the issues that were pertinent to the Trade Secret Act issue. Trade secrets are broadly defined in state and federal law, very broadly defined, and usually involve fact issues. Compilations of data, some of which may be public, still constitute trade secrets. The Washington Supreme Court's decision in the Lyft case, I think, is instructive. This was a situation where Uber and Lyft were required to provide data to the city of Seattle regarding the usage of those services. I mean, that's information, I suppose, if you track down every single Uber and Lyft driver, and there were thousands of them in the city of Seattle, you could consider to be public data. But the difference was the compilation of the data by these companies and providing it to the city of Seattle constituted the trade secret. Your friend on the other side seems to distinguish that by saying that this is a market with very few players, unlike the thousands potentially of Lyft or Uber drivers. Does that make any difference? No, and there were actually only two. We're only talking about Uber and Lyft. I mean, those are the only two companies that we're talking about. They had lots of drivers. No, but the amount of data is different. Yeah, I understand, Your Honor. But I think in this particular case, what you have is significant data that was compiled by BBSI, contrary to counsel's argument that creates the fact issue here. If you vet each individual temporary worker in accordance with the needs of the particular customer, you've gone through a process, you've gone through a significant process that requires time and attention to put together that list of individuals that's pertinent and beneficial to that particular customer. You've looked at that particular customer who has particular needs. They need them at certain times. They need it for certain kinds of crops. They need it for certain kinds of things. That, too, is pertinent and specific to that specific customer. And then you have the pricing margin. And contrary to what counsel said, I mean, what rival in the universe wouldn't want to know the whole card of their opponent? I mean, my Lord, you've got a situation where you know that you have to have this margin in order for BBSI to be profitable. Persona can come in and undercut that margin to their benefit. I mean, it's a magnificently beneficial thing for these individuals that have, you know, not exactly acted with honorable intentions by setting up a rival corporation, a rival company, five months before they departed BBSI. All of those things suggest you've got fact issues here that require the jury in the case to decide whether or not all of the elements have been met. But for purposes of summary judgment, these fact issues must result in a reversal of the district court's decision on summary judgment with respect to the Trade Secret Act claims. And we ask the court to do that. I do want to take you back to your referral to me to page 14. Yes, Your Honor. District court had described the Lanham Act claim as being based upon defendants posing as agents of BBSI to jewel fruit. And so I look at page 14, and that's not what I see there. Indeed, it talks about how Alejo updated the logo, didn't use the Barrett logo, used his own, what was it called, persona. So that's not portraying himself as being a representative of BBSI. That had inside information, so that's the general trade secret type claim. But is that a Lanham Act claim? I'm still missing what evidence supported the claim that he portrayed himself as being from BBSI as opposed to being this new competitor. We made arguments about that as well, Your Honor. Well, that's what I ask you to point me to, and you point me to page 14, and I'm having trouble finding that evidence. Well, I'm sorry, Your Honor, but you asked me to give you a citation to where there was a question about the misappropriation of the mark by virtue of the employment agreements, and that's what I provided you. I can get you the additional stuff. Well, okay, stay here. Where's the misappropriation of the mark? When it talked about the mark, it said Alejo updated the logo, but he didn't change the substance. Well, that may be a violation of trade secret, but that's not a violation of BBSI's identity. At that point, the claim is something different from what I understood the Lanham Act claim to be. And I'll get you the citations both in our opening, our second brief and in the reminder. Well, I just asked you for it. You came back. You gave me this. This doesn't seem to do it, so I'm not sure what I'm supposed to do. I apologize if I had misunderstood, Your Honor. My understanding was you wanted a citation to where we argued in the brief the question about taking the employment, the staffing agreements. I'm more than happy to get you that. No, no, no, no, no. My question was pointedly aimed at the attorney fee award, and I read from the district court's order that said no evidence was submitted to support the award. And I asked, so where's the evidence here? And you point me to page 14, and that doesn't appear to be evidence to support the allegation that they portrayed themselves as being representatives of BBSI. And we did make the argument in the briefs, and I'll provide that, and we also made that argument. We provided specific references to the excerpt of record in the FRAP 28J letter that you filed yesterday. Well, that brings up another question. We got that letter this week, and it was offered as being under Rule 28J. Now, what's 28J authorize? It's citation of supplemental authorities. That letter didn't mention any supplemental authorities, did it? It was a surreply. Well, it's a- Was there a single mention of a supplemental authority in that letter? I would suggest that a reference to the record, Your Honor, is a supplemental authority, but, you know- Really? I mean, okay. All right. Thank you. We thank counsel for their arguments. The case just argued is submitted.
judges: GRABER, CLIFTON, BENNETT